PATRICK v. ARKANSAS NATIONAL BANK.

Opinion delivered February 21, 1927.

1.  APPEAL AND ERROR—TRANSCRIPT OF EVIDENCE.—In a suit in chancery where the parties agreed that oral testimony might be taken in shorthand by a stenographer named and transcribed and filed, and, when so filed, should be treated as depositions of the witnesses and become part of the record, *held* that typewritten testimony, presented to the clerk and by him filed and certified as a complete transcript of the depositions of the witnesses, was sufficient showing of the evidence, though such testimony was not certified by the stenographer; there being no contention that any material part of the testimony was not in the transcript.

2.  BILLS AND NOTES—LIABILITY OF ACCOMMODATION PARTIES.—Persons interested in a corporation who, to avoid Rev. Stat. §§ 5200, 5239, limiting the amount a national bank may loan to a corporation, executed and indorsed to such bank their personal note for money turned over by them to the corporation for its use, *held* liable as accommodation parties, though the bank may have known that they were only accommodation parties.

3.  CORPORATIONS—CONTRACT FOR LIQUIDATION.—In a national bank's action on a note, proceeds of which were paid to a corporation to which a direct loan by a national bank would have been excessive, under Rev. Stat. U. S. §§ 5200, 5239, a cross-complaint of the maker and indorsers of the note, praying specific performance of a contract with a third person for sale and liquidation of the corporation's assets, was properly dismissed, where such defendants had first broken the contract.

4.  BANKS AND BANKING—LIABILITY OF PRESIDENT.—Where one interested in a corporation executed a note to a national bank, which was indorsed by other persons interested, and the proceeds were paid to the corporation, to which a direct loan would have been excessive under Rev. Stat. §§ 5200, 5239, *held* that the estate of the president of the bank, who was interested in such corporation and who knew of such arrangement, was not liable to the bank for the amount of the note, which was accepted by the cashier and approved by the board of directors in absence of the president.

Appeal from Washington Chancery Court; *Sam Williams,* Chancellor on exchange; reversed in part.

STATEMENT BY THE COURT.

The Arkansas National Bank brought suit in the Washington Circuit Court against F. M. Patrick, M. L. Price and R. M. Clark upon a promissory note for $10,000 executed to it by F. M. Patrick as maker, and indorsed

by M. L. Price and R. M. Clark. The defendants answered, denying the execution of the note; that the copy attached was a copy thereof; that they had ever paid interest thereon as alleged; and, as a further defense, alleged that the note sued on was executed for a loan made to the Ozark Poultry & Egg Company by the said bank; that said loan was an excess loan; that the $10,000 proceeds was paid over to the corporation, Ozark Poultry & Egg Company, the bank and its officials knowing at the time that the loan was an excess loan under the Federal statutes; and, by way of cross-complaint, in which M. L. Price and R. M. Clark joined, set up a contract between themselves and Mrs. Roberta Fulbright, to which the bank was not a party, entered into on about the 11th day of August, 1923, almost a year after the execution of the note sued on.

In the cross-complaint they prayed for a specific performance of the contract between Patrick, Price and Clark on one hand, Mrs. Roberta Fulbright on the other, for the sale of the holdings of the Ozark Poultry & Egg Company and it liquidation, and, in the alternative, if specific performance could not be had, for damages against Mrs. Fulbright for the alleged breach of the contract, and asked that a receiver be appointed to take charge of the assets of the said corporation. A copy of the contract for the sale of the holdings of the Ozark Poultry & Egg Company for payment of its debts was attached as an exhibit to the cross-complaint, which also contained a motion to transfer to equity.

On February 20, 1924, the bank replied to the answer of F. M. Patrick, and, in answer to the cross-complaint, denied the allegation made against the bank and its directors, and, by way of cross-complaint, set up the contract made between Patrick, Price and Clark and Roberta Fulbright on August 11, 1923, the same contract set out by said defendants in their cross-complaint, and alleged that Mrs. Fulbright was thereby constituted a trustee of the assets of the Ozark Poultry & Egg Company, and asked that she be held to account for the property of said

corporation disposed of under said contract; and also that there was an agreement therein by which the parties bound themselves to liability for payment of all the debts of said corporation, and prayed judgment against the defendants and each of them by reason of said agreement, and against her, Roberta Fulbright, as administratrix of Jay Fulbright, deceased; alleged that the loan represented by the notes sued upon was an excess loan made by Jay Fulbright in his lifetime, as president and director of the Arkansas National Bank, to the Ozark Poultry & Egg Company, and that she, as administratrix, was liable under §§ 5200 and 5239 of the Revised Statutes of the United States for the amount thereof, and prayed a recovery from her as such administratrix for same.

Roberta Fulbright, after moving the court to dismiss the cross-complaint for misjoinder of parties and the overruling of the demurrer to the cross-complaint, answered, denying all the allegations of both cross-complaints, that of Patrick, Price and Clark and of the Arkansas National Bank, attempting to fix a liability against her individually or in her representative capacity as administratrix of her husband's estate.

The contract for liquidation and sale of the assets of the Ozark Poultry & Egg Company, and the purchase of the stock or interest of Price, Patrick and Clark therein by Roberta Fulbright, administratrix of the estate of Jay Fulbright, was introduced in evidence, and expressly provides for the appointment of liquidation agents, and after inventory made by the parties selected for appraisement of the property, as follows:

"That the party of the first part and the parties of the second part shall each select a good and competent man, and the two selected shall select a third, and a majority of the three shall place what they believe to be a fair value on the building and real estate and holdings of the corporation, including the machinery, refrigeration, holdings, equipment, and all holdings, and the party of the first part shall accept the property so valued at the

price so placed upon it.* * * In case the appraisement of the fixed assets shall be thought to be unreasonable by either party, a second appraisement shall be had by appraisers appointed by the parties as in the first instance, and such second appraisement shall be that to be accepted.''

The testimony shows that Roberta Fulbright made a written demand for a second appraisement, in accordance with the terms of said contract; that the other parties objected to the appraisers she suggested; that she finally named another person for appraiser; that they continued to refuse to have a second appraisement, and finally filed a suit or cross-complaint, in which a receiver of the assets was asked for. The concern was then put into bankruptcy, and its remaining assets distributed in bankruptcy.

The testimony of Patrick, Clark and Price indicated that their refusal or failure to appoint an appraiser and have a second appraisement made was on account of their belief that the demand therefor was not made in good faith.

T. L. Hart, cashier of the bank, testified that he had been cashier since 1913, and identified the Patrick note sued on, which was a demand note for $10,000, payable to the order of said bank, with interest from date until paid, with the clause providing that the indorsers waive demand or presentation, etc., signed by F. M. Patrick, indorsed on the back ''M. L. Price and R. M. Clark,'' with three credits, 2-7-23, $200; 5-16-23, $200; 9-11-23, $200. He stated that, on the morning of November 15, 1922, he met Mr. Jay Fulbright in the street, and ''he told me he had arranged for Mr. Patrick to sign the note for $10,000, and Mr. Price would be up and fix it up. About something like an hour after that Mr. Price came in with the note already made out and indorsed, and I placed the proceeds of the note to the credit of F. M. Patrick. A little later in the day I went to Mr. Fulbright to find out if the note was signed like he understood it was to be signed, and he told me it was.''

The proceeds of the note were placed to the credit of Mr. F. M. Patrick. Later on in the day Mr. Patrick checked the money to the Ozark Poultry & Egg Company. Later witness made a demand on Price and Patrick for payment of the note, writing them a letter. The interest was paid on September 1, 1923. At the time the note was given by Mr. Patrick, the Ozark Poultry & Egg Company was indebted to the Arkansas National Bank in the sum of $12,000, represented by promissory notes. The capital and surplus of the bank at that time amounted to $130,000. Witness had not been consulted about making this loan to Patrick, except as in the conversation with Mr. Fulbright, already stated. On cross-examination witness stated that he placed the proceeds of the $10,000 note to the credit of F. M. Patrick, and it was entered in the account of Patrick on the books of the bank, but afterwards $10,000 was checked out of the bank by Patrick to the Ozark Poultry & Egg Company; that he had no control of Patrick's account in the bank, and had no authority to control the disposition of his account; had no specific knowledge that the loan was made for any other person than Patrick; was under the impression that it was a loan for the Ozark Poultry & Egg Company, as he did not know what Mr. Patrick would be borrowing that much money for.

Witness had no knowledge of what arrangement had been made between Mr. Patrick and the Ozark Poultry & Egg Company, and did not know the company had given to Mr. Patrick a note representing the amount borrowed. His only reason to believe it was a loan for the Ozark Poultry & Egg Company was the fact that Mr. Patrick checked the proceeds out to that company.

Witness did not believe at the time that it was an excess loan. It was reported to the board of directors afterwards, and the board took the regular action as on most loans, approving them as they read them. Mr. Fulbright had told me a number of times he considered Mr. Patrick good for his obligations. Mr. Fulbright was the principal financial power connected with the

Ozark Poultry & Egg Company, and, when loans were made to that company, they were arranged for 'through him.

This loan was never submitted to the loan committee of the bank, but was submitted to the board of directors after the loan was made. Mr. Fulbright was a director and president of the Arkansas National Bank, and was active in his office as president of the bank. "We paid a check drawn by the Ozark Poultry & Egg Company in favor of the First National Bank of Fort Smith for $10,000, as I remember, on the 16th day of November, 1922." Witness said if the loan had been made direct to the Ozark Poultry & Egg Company at that time it would have been an excess loan; did not recall that any excess loan had ever been made by the bank to the Ozark Poultry & Egg Company prior to that time. Stated that Mrs. Fulbright sat with the board of directors of the bank after his death, and suggested that the outstanding loan due should be looked after. Don't remember just what she said, but understood she wanted the matter looked after, and complied with her request. Think application was made to our attorney, Mr. Davidson, to bring suit upon this note.

Witness is unable to state regarding the listing of this note as a liability of the Ozark Poultry & Egg Company by the members of that company. Does not recall whether any of the checks received in payment of the interest on the note were signed by Price, Jordan, or Mr. Clark as manager. Does recall that Jay Fulbright never signed any of those checks. Witness was engaged during this time actively discharging the duties of cashier of the bank. The bank filed a claim in bankruptcy against the Ozark Poultry & Egg Company for $10,000 and received dividends from the bankruptcy court out of the estate; does not know whether Mr. Patrick filed such claim or not.

Introduced copy of bank record of the account of the Ozark Poultry & Egg Company, dated November 15, 1922, showing deposit on that date in favor of that

company of $10,494.77, and a check paid on November 16, 1922, for $10,000; also the minutes of the meeting of the board of directors on the 15th, showing the names of those present; that it did not show that Jay Fulbright was present at the meeting; otherwise his name would have been included; that the numbers of the notes which were read and approved at that meeting included the note for $10,000 sued on in this action.

Witness also introduced evidence of F. M. Patrick's personal account in the bank, showing a deposit to that account on November 15, 1922, of $10,000.

Patrick testified he had signed the note for $10,000; that it was prepared at the Ozark Poultry & Egg building, and the money was borrowed by him for the Ozark Poultry & Egg Company, which was $10,000 to pay a note at Fort Smith. The notes at the Fort Smith bank were signed by the poultry company, F. M. Patrick and Jay Fulbright as indorsers. "My impression was, in talking to Mr. Fulbright, he signified his dissatisfaction of borrowing so much money at Fort Smith and indorsing these notes, and I understand Mr. Fulbright fixed up this plan for me to sign this $10,000 note to retire one down there; that is the impression I had. There was a note due there, and they needed their money, and Mr. Fulbright would rather have interest in his own bank than to pay it down there, and that was the impression I received, to get the money up here instead of down there."

Witness denied it was agreed upon between him and the other members of the corporation, the Ozark Poultry & Egg Company, that he was to give the note and draw the money individually, instead of having the company do it; did say his understanding was that the company owed the bank its limit and could not borrow any more money in its own name. "That was the way it was represented to me. When he drew the check for the Ozark Poultry & Egg Company for $10,000, he gave it to Mr. Price, manager down at the house."

Price testified he was secretary and manager of the poultry and egg company from 1917 to August 13, 1923; that the note sued on in this case was prepared by his secretary in the office of that company, and signed and indorsed there. At the time the company had $25,000 borrowed money from Fort Smith on the First National Bank at Fort Smith, and it seemed the Arkansas National Bank had considerable money. The rate of interest at Fort Smith was virtually the same as at Fayetteville. "The Fort Smith bank having written a letter and advised that we could reduce our indebtedness $10,000, I mentioned the matter to Mr. Fulbright, and asked him what arrangement we had better make. He suggested that Patrick sign the note, in order to avert the banking laws, and it would be all right for him to sign it, and the Ozark Poultry & Egg Company could take credit for it, as we had the $12,000 borrowed at the Arkansas National Bank." Witness prepared the note at the office, let Mr. Patrick sign it, and took it to the bank for the purpose of getting credit for it; handed the note to Mr. Hart, cashier, as had been done in borrowing money heretofore. "I suggested it would be much better if we would deposit this $10,000 to the credit of Mr. Patrick and let Mr. Patrick give the check to the Ozark Poultry & Egg Company for a like amount, which was done. He mailed a check of the Ozark Poultry & Egg Company to Fort Smith on the same date to take up its $10,000 note held there by the First National Bank. I talked to Mr. Fulbright about reducing our loan in Fort Smith; told him I thought we had better take $10,000 off down there and put it in the Arkansas National Bank, and he said go ahead and have Mr. Patrick make a note for the $10,000;" said that at numerous times various members of the corporation of the Ozark Poultry & Egg Company made notes to the Arkansas National Bank for various sums, but that the company's signature was never for more than $12,000 borrowed money. Mr. Fulbright looked after the financial end of the company to a certain extent. He was down there a great deal, and appeared to be very much interested in that line of business.

Frank A. Handlin testified he was president of the First National Bank of Fort Smith, and that that bank, on about the 15th of November, '22, held five notes of the Ozark Poultry & Egg Company, three for $10,000 each and two for $5,000 each; that all the notes were guaranteed or indorsed by Jay Fulbright, F. M. Patrick and M. L. Price, and one of these $10,000 notes was paid November 15, 1922.

The chancellor, on hearing, held that Roberta Fulbright was not liable individually or as administratrix to the defendants, Patrick, Price and Clark, on their cross-complaint; that they refused to agree to a second appraisement of the assets of the poultry and egg corporation, and, by filing the cross-complaint herein, had breached the said contract for its liquidation, and released her from its performance; that there was no liability against her individually or as administratrix to the Arkansas National Bank on account of the contract of August 11, 1923, between herself and the other defendants of the Ozark Poultry & Egg Company, but held that the loan represented by the note signed by Patrick November 15, 1922, and indorsed by Price and Clark, was made to the Ozark Poultry & Egg Company, was made and knowingly assented to by Jay Fulbright, her intestate, as president and director of the Arkansas National Bank, and was an excess loan, for which he was liable to the bank, and that she, as administratrix, and Patrick, Price and Clark, were each liable to the bank for the amount due thereon, $7,585.46, and decreed accordingly.

Roberta Fulbright, as administratrix, appealed from that part of the decree holding her liable to the bank for said sum. The other defendants appealed from the decree dismissing their cross-complaint and rendering judgment against them upon the notes sued on by the bank.

The decree also recites that:

"It is agreed in open court, by all the parties to this suit, that the oral testimony of the witnesses may be

taken in shorthand by Marcus Fietz and by him transcribed in typewritten form and filed herein, either in term time or vacation, and, when so taken and filed, shall be treated as depositions of the witnesses and become a part of the record in this cause, and the costs of the taking of said testimony in shorthand and the transcribing of same shall be taxed as costs in this suit as other costs are taxed.''

The testimony of the witnesses was transcribed with the caption of this recital of the decree, and marked ''Filed March 22, 1926. E. P. Watson, clerk.'' The testimony of all these witnesses and all the testimony so transcribed and filed was brought up to this court by certiorari, with the clerk's certificate that the above and foregoing pages from 2 to 301 in volume 2 contained a true, perfect and complete transcript of all the depositions, exhibits thereto, entries and proceedings of the witnesses mentioned in the writ of certiorari in the cases,'' giving the style thereof, Arkansas National Bank v. F. M. Patrick et al., defendants, ''as the same now appears on file in my office,'' which makes a true and complete transcript of the diminution suggested by said writ, etc.

W. N. Ivie, for Patrick et al., appellants.

John W. Grabiel and John W. Nance, for Fulbright

J. V. Walker and B. R. Davidson, for appellee.

KIRBY, J., (after stating the facts). It is first urged that there is no oral testimony properly included in the record, that the decree of the chancellor must be presumed to be correct, and the case affirmed accordingly. The decree recites that all the parties agreed in open court that the oral testimony of the witnesses may be taken in shorthand by the stenographer, naming him, and by him transcribed in typewritten form and filed herein, either in term time or vacation, and, when so taken and filed, shall be treated as depositions of the witnesses and become a part of the record in this cause. What purports to be the testimony of the witnesses was presented to the clerk in typewritten form and by him filed and certified to this court as a true, perfect and complete

transcript of all the depositions, exhibits thereto, entries and proceedings of the witnesses mentioned, etc.

Counsel for appellant contend that this transcript of testimony is not sufficiently identified as having been taken by the stenographer in accordance with the agreement, there being no certificate by him thereto, nor properly made a part of the record of the case by bill of exceptions, submitted to them for examination and certified by the trial judge. They do not contend, however, that there was any material testimony that is not included in the corrected record here. The court is of opinion that, under the agreement of the parties that the oral testimony, when transcribed and filed, either in term time or in vacation, shall be treated as depositions of the witnesses and become a part of the record in this cause with the certificates of filing by the clerk, and to the transcript that it contains all the testimony, etc., is sufficient to show the evidence upon which the cause was heard. *Lenon* v. *Brodie,* 81 Ark. 208, 98 S. W. 979; *Sanders* v. *W. B. Worthen,* 122 Ark. 104, 182 S. W. 549; *Massey* v. *Kissire,* 149 Ark. 215, 232 S. W. 24; *McMillan* v. *Brookfield,* 150 Ark. 518, 234 S. W. 621.

Although appellants, Price, Patrick and Clark, denied the execution of the note to the bank, in their answer, the note itself, with their signatures and their admissions in testimony, shows its execution and indorsement by them, and the undisputed testimony shows that the bank loaned the money thereon, and passed it to the credit of the maker, Patrick, who afterwards checked it out to the corporation, which used it in payment for a note they were liable on to another bank. At the very least, they could not be considered other than accommodation parties and liable on the instrument to the holder for value, notwithstanding such holder may have known, when taking it, that they were only accommodation parties. Crawford & Moses' Digest, § 7795; *Hamilton* v. *Brown,* 88 Ark. 97, 113 S. W. 1014; *Fox* v. *State,* 102 Ark. 451, 145 S. W. 228; *First National Bank* v. *Allen,* 141 Ark. 328, 216 S. W. 1039.

It is next contended that the court erred in dismissing their cross-complaint against Roberta Fulbright on the contract for the sale of their stock in, and liquidation of the debts of, the Ozark Poultry & Egg Company. The court found, however, that these parties had, in violation of the terms of the said contract, refused and failed to select an appraiser and to make a second appraisement of the fixed assets of said corporation, upon the demand of Roberta Fulbright, in accordance with the express agreement therein that such second appraisement should be made if either party thought the first appraisement unreasonable, and by filing of the cross-complaint herein, which amounted to a substantial breach of the contract and released her from its performance. This finding of the facts is supported by the testimony, and no error was thereby committed, nor in declaring such finding a breach of the contract that released Roberta Fulbright from liability to them for any failure to perform it. They claimed that she was liable to them for payment of the value of their stock in said corporation, to be ascertained by the appraisement and sale of its assets and property, in accordance with the terms of the agreement therefor.

It is undisputed, however, that one of them, Price, shortly before the making of said contract, had offered to buy the one-half of the stock of the Ozark Poultry & Egg Company owned by her intestate, her husband, at the time telling her that he found that the company had come to the end of their row. They were heavily indebted, owed $50,000 to the banks, and the liquid assets amounted to about $39,000; "that the company was worth $18,000 less than nothing," but that he would see that she would not lose anything, and would give her $6,000 par value for the stock.

The liquidation of the corporation proceeded under the agreement until the appellants filed their cross-complaint against her, asking for receiver of the assets, and the corporation was then put into bankruptcy, and its administration there failed to show the payment of its

debts and that the stock of appellant was of any value whatever.

The decree as to these appellants is correct, and is affirmed.

The court erroneously held the estate of Jay Fulbright, a director and president of the bank at the time the loan was made, responsible for the payment of the balance due thereon, adjudging it an excess loan knowingly made by him as a director of the bank.

The bank first brought suit against Patrick, Price and Clark on the note executed by Patrick and indorsed by the other, and finally, in the denial of the allegations of the answer and cross-complaint of Patrick, alleged that the loan represented by the note sued on was an excess loan to the Ozark Poultry & Egg Company, made by Jay Fulbright, the director and president of the bank, knowingly and in violation of the National Banking law, and that Roberta Fulbright, as his administratrix, was liable to the bank to the payment of the balance due thereon, under §§ 5200 and 5239 of said statute. On this point it made the following finding of fact:

"That on said date aforesaid (November 15, 1922), the deceased, Jay Fulbright, while acting both as president and director of the plaintiff, Arkansas National Bank, and as president and director of the said Ozark Poultry & Egg Company, negotiated, granted and made to the defendant, F. M. Patrick, a loan of $10,000, which was evidenced by a promissory note executed by said defendant, Patrick, and indorsed by the defendants, M. L. Price and R. M. Clark; that said loan was made to the defendant, Patrick, for the benefit of the Ozark Poultry & Egg Company."

The Ozark Poultry & Egg Company, hereafter called the corporation, was indebted, at the time of this loan, to the bank in such a sum as that the amount of the loan, $10,000, would have been in excess of the amount the bank, with its capital and surplus, could lend to any one person, firm or corporation. The testimony shows that Fulbright was the president of the corporation, which had

been doing an extensive business, as well as director and president of the bank. The directors of the corporation, before the making of this loan, had on numerous times borrowed money from the bank on paper executed by them.

This loan was applied for by Patrick, the maker, presenting the note, which had already been signed and indorsed at the office of the corporation, to the cashier of the bank, who advanced the money thereon, placing it to the credit of the maker of the note, who, later that day, checked it out to the corporation, which used it in payment of one of its notes due to a bank in Fort Smith. The corporation charged itself with the money as having been received from and due to Patrick, the maker of the note.

Unquestionably these individuals, the maker and indorsers of the note, had the right to borrow money from the bank, and it was not unusual for them to do so, and lend it to the corporation, of which they were directors and stockholders. They were separate and distinct persons from the corporation, and not personally liable to the payment of its debts. The money borrowed by the corporation from the bank constituted no liability against them, personally or individually. They were not an association, or a company or firm, nor with the corporation any person within the meaning of said § 5200 of the statute, providing that total liability of any borrower shall at no time exceed one-tenth part in amount of the capital stock. This corporation was not thought to be insolvent at the time this money was borrowed from the bank by Patrick and his indorsers, and by them loaned to it. The cashier, after making the loan, later asked Fulbright, the president of the bank and also of the corporation, first, after telling him that the loan had been made on the note signed by Patrick and indorsed by the other two, if it was signed as it should have been, and he replied that it was.

It is true some of the witnesses liable to the payment of the note stated it was agreed to be made and the loan procured for the corporation in that way to avoid the

appearance of its being a loan to the corporation, which would have been an excess loan made to one borrower in violation of the statute. The witnesses, however, were liable to the payment of the note in any event, and seeking to escape such liability by transferring it to the estate of Fulbright, who could not testify about the transaction.

The chancellor found, too, that Jay Fulbright, while acting both as president and director of the plaintiff bank and of the corporation, "negotiated, granted and made to defendant, F. M. Patrick, a loan for $10,000, which was evidenced by a promissory note executed by said defendant, Patrick, and indorsed by the defendants, L. M. Price and R. M. Clark;" that said loan was made to the defendant, Patrick, "for the benefit of the corporation."

Even if it could be said that the $10,000 loan to Patrick was a loan indirectly to the corporation, of which Fulbright was president, and for the making of which the directors of the bank would be liable for the resulting damages under the law prohibiting an excess loan to one borrower, corporation, association, individual, partnership and members thereof, then it is more nearly true, and the proof would have warranted the finding, that Fulbright only procured the making of the loan, which was granted by the cashier of the bank, and later approved by its board of directors, at a meeting from which he was absent, and in the making of which loan he did not knowingly participate in his capacity as director or officer of the bank. This transaction is unlike that in the case of the *Corsicana National Bank* v. *Johnson,* 251 U. S. 68, where the testimony showed there was an excess loan to two persons, individuals, in making which the bank director knowingly participated, rather than two loans, neither of them excessive, made to borrowers severally. It was shown that one of the parties indorsed the note of the other, the maker of which in turn indorsed his note for a like sum, which would not have been an excess amount. These individuals had been partners and jointly interested in many ventures, and were still partners in some, and the transaction was treated as

one in the making of the loan by the bank, the money being forwarded by check or draft payable to the order of the two individuals jointly, as though they were a firm or partnership.

Here, as already said, while it is true the maker and indorsers of this note were directors of the corporation to which they loaned the money borrowed by them, they were entirely separate and distinct persons from said corporation, and without personal liability to the payment of its debts or performance of its obligations.

It follows that the court erred in holding Roberta Fulbright, as administratrix of the estate of her deceased husband, liable to the payment of the balance due on said Patrick note. The cause is therefore remanded to the chancery court, with directions to dismiss the action as against the said administratrix.